**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- x
ROY TAYLOR,                                                                                   :
                                             *Plaintiff*,                                     :
                                                                                              :
             -against-                                                      :          1:22-cv-09747 (ALC)
                                                                                              :
COMMISIONER MOLINA et. al,                                    :          <u>OPINION & ORDER</u>
                                             *Defendants*.                          :
                                                                                              :
-------------------------------------------------------------------- x
**ANDREW L. CARTER, JR., District Judge:**

## A.  INTRODUCTION

Plaintiff, proceeding *pro se*, brought this action against Commissioner Molina, Dr.

Goldberg, Captain Ferber, and Officers Carter, Whyte, and Fowling (collectively, "Defendants").

Plaintiff alleges that Defendants violated his rights by denying him medical treatment in

contravention of both federal and state law. Dkt. No. 2. Now before the Court is Defendants'

Motion for Judgment on the Pleadings (the "Motion"). Dkt. No. 95. In their Motion, Defendants

contend this action is barred by a General Release signed by Plaintiff on February 9, 2022

(hereinafter, the "First Release"); Defendants thus seek dismissal of this action in its entirety. For

the reasons outlined below, the Motion is **DENIED**.

## B.  BACKGROUND

Plaintiff's filings, including his pleadings, are convoluted and difficult to understand. For

clarity, the Court begins with an explanation of the claims before this Court.

### I.        Procedural Background

Plaintiff initiated this action on November 15, 2022. Dkt. No. 2. In the Complaint,

Plaintiff sought damages for, what the Court construed as, claims arising under 42 U.S.C. § 1983

1

and associated claims under New York state law. Dkt. No. 6. Plaintiff claims in the Complaint include the following:

1. ***Claim One: Plaintiff's claim for excessive force, as well as the delay and denial of adequate medical treatment*** – Plaintiff alleges that on December 21, 2021, while he was being held at Anna M. Kross Center ("AKMC"), a Department of Correction ("DOC") facility located on Rikers Island, several unidentified "John Doe" correction officers woke him from his sleep and ordered him to submit to a body search. Plaintiff refused and requested to be searched by a "body scanner," which is allowed under DOC policy. One "John Doe" correction officer sprayed Plaintiff with a chemical agent in Plaintiff's eyes, one inch from Plaintiff's face, in violation of DOC policy. The correction officer then forced Plaintiff to walk out of his cell to the "bridge" and to wait there for 30 minutes while Plaintiff suffered from chemical burns on his face, instead of allowing him to go to a fan (to relieve the burning sensation) and to decontaminate his face within 15 minutes of being sprayed, as required by DOC policy. Plaintiff was then brought to the AMKC infirmary, but was told by the medical staff that there was nothing that they could do. They tried to "downplay" the incident and sent him back to his housing unit while he was still experiencing chemical burns.

2. ***Claim Two: Defendants' failure to treat a fungal-nail condition and injury on Plaintiff's feet*** – Between 2019 and 2021, while Plaintiff was held, on occasion, at the West Facility (which is another DOC facility located on Rikers Island), he complained to prison officials that he had a fungal-nail condition that was getting worse; he requested to be given "lamicil" medication for it. Defendant Goldberg

refused. Plaintiff asked whether the facility's infirmary had that medication, but Goldberg refused to discuss the matter. After reviewing Plaintiff's medical record, Plaintiff learned that Goldberg falsely wrote in that record that Plaintiff has stated that "lamicil" did not work for him. Goldberg appears to have either delayed or refused to treat Plaintiff's fungal-nail condition, and it has since gotten worse than before. Plaintiff was later transferred to a different facility called Auburn. Since Plaintiff has been incarcerated in Auburn, he has continued to complain about his fungal-nail condition, and has requested "lamicil." He has also complained about an injury he sustained to his right heel in the summer and fall of 2022, but DOCCS officials at Auburn and in Albany have failed to treat those conditions.

3. ***Claim Three: Delay and denial of adequate medical treatment and failure to protect Plaintiff from a serious risk of harm*** – During an unspecified period between June 28, 2018, and December 13, 2021, while Plaintiff was held in the AMKC, he experienced flu-like symptoms, including fever. Plaintiff reported his condition to AMKC medical and correction staff, including Correction Officer Shepard. Plaintiff was told that correction officers were unavailable to escort him to the infirmary. Every day, however, Defendants Correction Officers Whyte and Carter chose prisoners in Plaintiff's housing unit to escort to the AMKC infirmary. On December 13, 2021, Plaintiff requested that they escort him to the infirmary, but they refused. Plaintiff then "forced [his] way out and escorted [himself] to the infirmary [but] Carter tried to make it difficult for [him] to enter the" infirmary. (Dkt. No. 2 at 6.) Plaintiff asked a member of the medical staff to take his temperature, but he/she refused. An alarm was activated, and AMKC Warden Hamilton arrived with several

3

correction officers. Plaintiff complained about his situation to Warden Hamilton. He was then refused medical care and was escorted back to his housing unit. The next day, December 14, 2021, Plaintiff experienced the same symptoms and forced his way back to the infirmary. This time, he was examined and it was determined that he was suffering from COVID-19. Plaintiff was transferred to the George R. Vierno Center ("GRVC"), also on Rikers Island, to be housed with other prisoners suffering from COVID-19. DOC officials were supposed to test prisoners daily for COVID-19, but they did not. While still transferring COVID-19-postive prisoners into quarantine, DOC officials did not transfer prisoners out of quarantine when their quarantine periods expired, which posed a risk to prisoners, including Plaintiff, who completed their quarantine periods of getting (re)infected with COVID-19.5

4. *Claim Four: Failure to allow payment of 10% of bail amount* – In 2021, while Plaintiff was held in the AMKC, he won a lawsuit and arranged for the unspecified amount of funds he won from that lawsuit to be deposited in his facility trust-fund account. Plaintiff then submitted a disbursement request to the AMKC cashier, and to unidentified "John Doe" and "Jane Doe" correction officers, for $17,500 (which was 10% of his total $175,000 bail amount) to be paid to the state court for bail; a newly enacted state bail-reform law allows prisoners to pay that percentage of their bail from their facility trust-fund accounts. While the DOC has a policy allowing prisoners to pay the entire amount of their bail from their facility trust-fund accounts, it would not allow Plaintiff to pay the state court 10% of his bail amount, as allowed by the newly enacted state bail-reform law. Plaintiff holds Correction Commissioner

Molina responsible for the practice of not allowing DOC prisoners to pay 10% of their bail amounts from their facility trust-fund accounts.

5. ***Claim Five: Failure and delay in treating Plaintiff's left-hand condition*** – In January 2019, while Plaintiff was held on Rikers Island, he complained about the constant throbbing pain he was experiencing from a growth (a cyst or a lump) that had appeared on his left hand. It was not until 2021 that Defendant "Hand Doctor" provided treatment. Before then, unidentified "Rikers Island Medical Administrator [and] Head Doctors . . . John Doe 2 [and] 3 all simply issued out pain meds which was putting a [band aid] on the problem and at first [they] refuse[d] to refer [him] to medical." (Dkt. No. 2 at 7.) Plaintiff was taken to Bellevue, where he underwent an MRI exam and physicians there took x-rays; physicians misdiagnosed his symptoms and gave him an injection, which did nothing. Plaintiff explained the origin of his hand condition, but the medical staff ignored him. While Plaintiff has been incarcerated in Auburn, unidentified defendants there have delayed treatment on his hand, allowing his hand condition to get worse.

6. ***Claim Six: Seizure of Plaintiff's criminal-trial clothes*** – In July 2019, while Plaintiff was held in the Otis Bantum Correctional Center ("OBCC") on Rikers Island, his family mailed him clothes (including shoes) to wear during his criminal trial. When Plaintiff was transferred to the AMKC from the OBCC, unidentified DOC personnel, including an unidentified "John Doe" correction officer and an unidentified "John Doe" correction captain, seized those clothes, claiming that Plaintiff was not allowed to have them. In the spring of 2022, Plaintiff was transferred to the North Infirmary Command (NIC), another facility on Rikers Island, and his criminal trial was about to

5

start; he was told that most of the clothes that his family had sent him, which he was going to wear during his criminal trial, were missing – the clothes were never found.

Plaintiff asserted these claims against the following defendants: (1) "New York State Dept of Correction Employees"; (2) New York City Correction Commissioner Molina; (3) unidentified New York City Department of Correction ("DOC") employees; (4) unidentified "John Doe 4 Auburn Medical ADM"; (5) unidentified "Healthcare Provider Jane Doe 4"; (6) Anna M. Kross ("AMKC") Correction Officer Whyte; (7) AMKC Correction Officer Carter; (8) unidentified AMKC employee "John Doe 1"; (9) unidentified "AMKC Med ADM John Doe 2"; (10) unidentified AMKC "Jane Doe 1 Cashier"; (11) unidentified AMKC "Jane Doe 2 GO Officer"; (12) "West Facility Foot Dr Goldberg"; and (13) unidentified "Bellevue Hand Dr Jane Doe 5."

After reviewing the Complaint, the Court determined that this district was not the proper venue for all of Plaintiff's claims. Therefore, on January 5, 2023, the Court issued an Order severing Plaintiff's claims arising from events that allegedly occurred at Auburn, including Plaintiff's claims against "New York State Dept of Correction Employees" and unidentified Defendant "John Doe 4 Auburn Medical ADM," and transferred those claims to the United States District Court for the Northern District of New York. Dkt. No. 6 at 5–6. As a result, the only claims before this Court are Claims One, Three, Four, and Six (together, the "At-Issue Claims"). The At-Issue Claims contain factual allegations that begin in June 28, 2018 and end in the Spring of 2022. It is against this procedural backdrop that the Court now turns to the factual dispute that defeats Defendant's Motion.

6

## II.        Factual Background

The Court assumes the Parties' familiarity with the factual background of this case and, thus, includes here only the facts relevant to the resolution of the Motion.[1] Of particular relevance to this Opinion are two releases that were executed by Plaintiff and the City of New York. Dkt. No. 81. As noted above, the First Release was executed on February 9, 2022. *Id.*, Exhibit A at 2. The First Release was made to resolve comptroller claim number 2020PI000474. In the First Release, Plaintiff (who at that time was represented by counsel) in consideration of $7,500, agreed to, "voluntarily, knowingly, and willingly release[] and forever discharge[] the City of New York, its agents and employees from any and all liability [. . .] any and all claims, causes of action, suits [ . . .] for, upon, or by reason of any matter, cause or thing whatsoever that occurred through the date of [the] Release, with the sole exception[]" of several matters that were already pending at that time. Dkt. No. 81, Exhibit A at 1. Notably, none of the events described in the At-Issue Claims were listed, discussed, or otherwise included in the list of excepted matters in the First Release.

On November 15, 2022, nearly nine months after signing the First Release, Plaintiff filed this lawsuit against the City of New York and numerous City employees. Dkt. No. 2. Then, on July 17, 2024, Plaintiff executed a second general release (the "Second Release"). The Second Release was made to resolve a separate civil suit initiated by Plaintiff (namely, *Taylor v. Trigeno, et. al.*, No. 16-cv-1143 (S.D.N.Y. 2016)). The Second Release contained language similar to the First Release and again purported to release and discharge the City of New York, its agents, and employees "from any and all liability, claims, or rights of action alleging a

---

[1] Additional factual background for this case is set forth more fully in both the Opinion and Order denying Plaintiff's motion to sever and adjudicate his property claim on summary judgment (Dkt. No. 69), and the Opinion and Order Denying Plaintiff's Motion for Reconsideration (Dkt. No. 87).

violation of [Plaintiff's] civil rights and any and all related state law claims, from the beginning of the world to the date of this General Release." Dkt. No. 81, Exhibit B at 5. The Second Release was made in consideration of $9,000, had an attached Stipulation of Settlement, and both the release and the stipulation contained a carve-out provision that excepted several cases from the Second Release, including this matter. *Id.*

On August 8, 2025, Defendants, pointing to the First Release, moved for judgment on the pleadings. Dkt. No. 95. Specifically, Defendants contend that this suit must be dismissed because "(I) this action is barred [by the First Release]; (II) [the Second Release] does not supersede or otherwise modify [the First Release]; and (III) assuming Plaintiff's claim for "lost personal property" is not covered by [the First Release], it fails to state a claim." Dkt. No. 98 at 3. Plaintiff claims that Second Release supersedes the first and contends, in the alternative, that the releases are invalid. Having reviewed the Complaint, the Motion, Plaintiff's Opposition, Defendants' Reply, and all documents attached thereto, the Court concludes that Defendants have failed to establish that Plaintiff waived his constitutional rights under either release. In the absence of clear waiver, this action may proceed, and because this action may proceed the Court may exercise supplemental jurisdiction over Plaintiff's claim for lost personal property. For these reasons, the Motion is denied.

### C.  DISCUSSION

**I.        Legal Standard**

Rule 12 provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The burden is on the movant to demonstrate that it is entitled to judgment on the pleadings. *Juster Assocs. v. City of Rutland, Vt.*, 901 F.2d 266, 269 (2d Cir. 1990). "Judgement on the pleadings is appropriate

where ***material facts are undisputed*** and where a judgment on the merits is possible merely by considering the contents of the pleadings." *Gomez-Kadawid v. Lee*, No. 20-CV-01786, 2023 U.S. Dist. LEXIS 102935, at *9 (S.D.N.Y. June 13, 2023) (citation omitted) (emphasis added). "Judgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery, even if the trial court is convinced that the party opposing the motion is unlikely to prevail at trial." *Id*. (citation and internal quotation marks omitted).

"In assessing a motion for a judgment on the pleadings, [courts] apply the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." *Chavis v. Zodlow*, 128 F. App'x 800, 802-03 (2d Cir. 2005) (citation and internal quotation marks omitted). "[T]he court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

In addition, "[w]hen considering motions [for judgment on the pleadings against] plaintiffs proceeding *pro se*, courts in this Circuit are instructed to construe the pleadings liberally. This is especially true when dealing with civil rights complaints." *Id*. (second alteration original). However, a court must be mindful that the plaintiff's "*pro se* status does not exempt [them] from compliance with relevant rules of procedural and substantive law.'" *Greenblatt v. Gluck*, 265 F. Supp. 2d 346, 350 (S.D.N.Y. 2003) (citations omitted).

## II.        Defendants' Motion for Judgement on the Pleadings

1.   Plaintiff's Property Loss Claim is Not Barred by the First Release

Accepting the allegations in the Complaint as true, as the Court must on a motion for judgment on the pleadings, Plaintiff's lost property claim did not accrue until he discovered that his property was missing in the Spring of 2022. Although the Complaint does not specify the

precise month of Plaintiff's discovery, "spring" is a well-defined season that typically runs from late March to late June. Plaintiff's property loss claims thus clearly could not have been barred by the First Release, which was executed in February 2022.

2.   The Court may Exercise Supplemental Jurisdiction Over Plaintiff's Claim for Property Loss Under New York State Law

Defendants claim that even if Plaintiff's property loss claim did not accrue until after the execution of the First Release, Plaintiff nonetheless fails to state a claim, as there is no federal cause of action for lost personal property. Defendants' thus seek dismissal of Plaintiff's property loss claim on the merits. Dkt. No. 98 at 8–10. Defendants are correct that, in general, there is no federal cause of action for lost personal property. *Id*. However, as Defendants' note, an incarcerated Plaintiff that suffers property loss may assert several state law causes of action including "negligence, replevin, or conversion." *Id*. Therefore, the Court's determination that there is no federal cause of action for property loss is the beginning, not the end, of this inquiry.

As it relates to Plaintiff's property loss claim, the Complaint states that Defendants are "liable for negligence" in their failure to properly store and/or investigate the disappearance of Plaintiff's missing clothing. Dkt. No. 2 at 8. Claim Six of the Complaint says nothing about due process violations or any other constitutional violations of Plaintiff's rights. The Court thus construes Plaintiff's claim as one for negligence under New York state law, not one for deprivation of property in violation of the Fourteenth Amendment.

The issue of whether Plaintiff has successfully alleged a claim for negligence under New York State law was not raised by either party. Therefore, assuming without deciding that Plaintiff has successfully alleged such a claim, the Court may, in its discretion, exercise supplemental jurisdiction over the state law claim. Defendants contend that the Court should

10

decline to do so because there are no anchoring federal causes of action over which the Court has jurisdiction. Dkt. No. 98 at 9–10. Not so; as discussed below, each of the remaining At-Issue Claims survive Defendants' Motion. Because these claims were brought pursuant to 42 U.S.C. § 1983, the Court may properly exercise supplemental jurisdiction over Plaintiff's state law claim for negligence. *Morton v. Cty. of Erie*, 796 F. App'x 40, 42 (2d Cir. 2019) ("Federal courts may exercise supplemental jurisdiction over state law claims in civil cases in which they have original jurisdiction.")

       3.   The Second Release Agreement Does Not Modify the First Agreement

Here, the Parties dispute whether the Second Release modified the First Release such that Plaintiff was (and is) allowed to bring this action.[2] *See supra* § B. II. Again, given Plaintiff's *pro se* status, the Court construes Plaintiff's motions "liberally . . . reading [his] submissions to raise the strongest arguments they suggest." *Supra* § C. I. As it relates to the releases, the Court takes Plaintiff to be arguing that the Second Release, which contained a carve out for this action, modified and/or superseded the First Release such that Plaintiff could bring this suit. Plaintiff's argument is not entirely without merit, as "[i]t is well established that a subsequent contract regarding the same matter will supersede the prior contract." *Braxton v. City of N.Y.*, No. 1:17-cv-00199, 2019 U.S. Dist. LEXIS 160966, at *9 (S.D.N.Y. Sep. 17, 2019) (quoting *Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 526 (2d Cir. 2011)). This general principle applies to releases. *Id*.

---

[2] If the First Release were the only general release in existence, then Defendants are correct that the First Release would bar this suit. *See* Dkt. No. 98 at 4–6. However, the existence of the Second Release creates a factual dispute the Court must resolve concerning whether Plaintiff bargained for the ability to maintain this action in consideration for signing the Second Release.

11

"Settlement agreements and releases are construed according to the general principles of contract law." *Collins v. Harrison-Bode*, 303 F.3d 429, 433 (2d Cir. 2002). Subsequent contracts not pertaining to "precisely the same subject matter" will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract.'" Marsh v. Cabrini Med. Ctr., No. 8 Civ. 5405 (RJS), 2009 WL 1726331, 2009 U.S. Dist. LEXIS 56980, (S.D.N.Y. Apr. 6, 2009) at *9-10 (internal citations omitted). To determine whether "a particular provision is superseded by a provision in a subsequent contract, the Court considers (1) whether there is an integration and merger clause that explicitly indicates that the prior provision is superseded; (2) whether the two provisions have the same general purpose or address the same general rights; and (3) whether the two provisions can coexist or work in tandem." *Dresser-Rand Co. v. Ingersoll Rand Co.*, No. 18-cv-3225, 2019 U.S. Dist. LEXIS 55087, at *10-11 (S.D.N.Y. Mar. 29, 2019) (internal citation and quotation marks omitted).

Defendants contend that the Second Release does not supersede or otherwise modify the First Release because the two releases do not cover precisely the same subject matter and there is no integration or merger clause in the Second Release. Dkt. No. 98 at 7–8. The Court agrees.

### a. The Agreements Do Not Cover Precisely the Same Subject Matter

As discussed above, each release relates to a different settlement for a different case—the First Release relates to a comptroller claim number 2020PI000474, and the Second Release relates to a civil suit. *Supra* § B. II. In addition, each release covers all potential claims or causes of action accrued by Plaintiff up to a certain date, and each date is different. It is thus clear that the two releases do not deal with the exact same subject matter. Therefore, whether the Second

Release modified the First Release rests on the three-part inquiry outlined above. The Court addresses each prong in turn below.

      b.    There is No Definitive Language Indicating the Second Release Agreement Revokes, Cancels, or Supersedes the First Release.

Both releases purport to release and discharge the City of New York, its agents, and employees from any and all civil rights claims made by Plaintiff from the beginning of the world through the date of the release. However, looking at the four corners of the Second Release, the Court finds no language that would suggest the Second Release is intended to modify, cancel, revoke, or supersede the First Release. Plaintiff contends that his inclusion of this case in the carve-out provision of the Second Release revoked the waiver of his claims in this suit that he agreed to in the First Release. Plaintiff is incorrect; his inclusion of this action in the carve-out provision of the Second Release without more is insufficient to support such a claim as a matter of law. *See Dresser-Rand Co.* at *10-11 (S.D.N.Y. Mar. 29, 2019). Just as the entire Second Release fails to supersede the First Release, the carve-out provision in the Second Release does not supersede the carve-out provision in the First Release.

      c.    The Two Provisions Do Not Have the Same General Purpose or Adress Same General Rights.

As discussed above, although both releases concern Plaintiff's release against the City of New York, its agents, and employees from any and all civil rights claims pursuant to a settlement, these releases were executed in connection with different matters, involved different settlement amounts, and were executed on different dates. They thus have different general purposes (i.e., to settle a comptroller action versus settling a civil suit) and address different rights (i.e., Plaintiff's rights through February 9, 2022, versus Plaintiff's rights through July 17, 2024).

d.   The Provisions Could Work Together

Defendants concede that the carve-out provisions in the First Release and Second Release can coexist or work in tandem. Dkt. No. 98 at 8. The Court agrees. The Second Release allows Plaintiff to pursue claims in this action that accrued after the date of the First Release—like the property claim.

Because the Court concludes that the Second Release does not pertain to precisely the same subject matter as the First Release; does not have definitive language indicating it revokes, cancels, or supersedes the First Release; and does not have the same general purpose or address the same general rights as the First Release, the Court holds that the Second Release did not modify the First Release.[3] The Court's conclusion that the Second Release does not supersede or otherwise alter the First Release does change the Court's holding that judgment on the pleadings is not appropriate here, because Plaintiff also challenges the validity of the releases.

1.   Defendants Have Not Sufficiently Established Plaintiff's Waiver of His Constitutional Rights.

Independent of the question of whether the Second Release modified the First Release such that this action may proceed, there is also the question of whether either release is valid. "[W]here a release would waive a fundamental constitutional right, such as those guaranteed by 42 U.S.C. § 1983, the question of validity is controlled by federal law." *Valdiviezo v. Greer*, 2018 U.S. Dist. LEXIS 172153, at *17 (E.D.N.Y. Oct. 4, 2018). A court may ascertain whether a party knowingly and voluntarily waived his rights only "after a careful evaluation of the totality

---

[3] To be clear, that is not to say that a plaintiff in a civil action cannot re-negotiate their ability to bring a lawsuit in consideration of signing a separate general release; it is just to say that Plaintiff did not do so here.

of all surrounding circumstances." *Id*. An examination of the "totality of the circumstances" is a fact-intensive inquiry that requires a court to consider:

> 1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds [ ] benefits to which the [the plaintiff] was already entitled by contract or law.

*Id*. Such a fact-intensive inquiry is better suited for a motion for summary judgment than a motion to dismiss.[4]

### D.  CONCLUSION

For the reasons set forth above, Defendants' Motion (Dkt. No. 95) is **DENIED**. The Parties are **ORDERED** to undergo limited discovery concerning the validity of the releases. The Parties are further **ORDERED** to submit a proposed discovery schedule by April 13, 2026.

The Clerk of Court is respectfully directed to terminate the pending motions at Dkt. Nos. 95, 99–100.

**SO ORDERED.**

**Dated:**      **March 31, 2026**
             **New York, New York**         _____
                                            **ANDREW L. CARTER, JR.**
                                            **United States District Judge**

---

[4] While Defendants indicate that Plaintiff was represented by counsel for the First Release, they do not discuss whether Plaintiff was represented by or consulted with an attorney in connection with the Second Release. Nor do Defendants talk about the amount of time the Plaintiff had possession of or access to the agreement before signing it or the role of Plaintiff in deciding the terms of the agreement. Further, it is unclear whether the Court can appropriately consider such facts on a motion for judgment on the pleadings because they lie outside the Complaint.